## TALTON *v.* MAYES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 227.   Argued April 16, 17, 1896.—Decided May 18, 1896.

The crime of murder committed by one Cherokee Indian upon the person of another within the jurisdiction of the Cherokee nation is not an offence against the United States, but an offence against the local laws of the Cherokee nation; and the statutes of the United States which provide for an indictment by a grand jury, and the number of persons who shall constitute such a body, have no application.

The Fifth Amendment to the Constitution does not apply to local legislation of the Cherokee nation, so as to require all prosecutions for offences committed against the laws of that nation to be initiated by a grand jury in accordance with the provisions of that amendment.

The question whether a statute of the Cherokee nation which was not repugnant to the Constitution of the United States or in conflict with any treaty or law of the United States had been repealed by another statute of that nation, and the determination of what was the existing law of the Cherokee nation as to the constitution of the grand jury, is solely a matter within the jurisdiction of the courts of that nation, and the decision of such a question in itself necessarily involves no infraction of the Constitution of the United States.

On February 15, 1893, a petition for *habeas corpus* was filed in the District Court of the United States for the Western District of Arkansas, setting forth that the plaintiff therein (who is the appellant here) was, on the 31st day of December,

1892, convicted, on a charge of murder, in a special Supreme Court of the Cherokee nation, Cooweeskoowee District, and sentenced to be hanged on February 28, 1893, and that petitioner was then held, awaiting the time of execution, in the national jail at Tahlequah, Indian Territory, by Wash. Mayes, high sheriff of the Cherokee nation. It was further alleged that the petitioner was deprived of his liberty without due process of law; that he was in confinement in contravention to the Constitution and laws of the United States, and also in violation of the constitution and laws of the Cherokee nation. These contentions rested upon the averment that the indictment under which he had been tried and convicted was void because returned by a body consisting of five grand jurors, which was not only an insufficient number to constitute a grand jury under the Constitution and laws of the United States, but also was wholly inadequate to compose such jury under the laws of the Cherokee nation, which, it was alleged, provided for a grand jury of thirteen, of which number a majority was necessary to find an indictment. The petitioner, moreover, averred that he had not been tried by a fair and impartial jury, and that many gross irregularities and errors to his prejudice had been committed on the trial. The district judge issued the writ, which was duly served upon the high sheriff, who produced the body of the petitioner and made return setting up the conviction and sentence as justifying the detention of the prisoner. Incorporated in the return was a transcript of the proceedings in the Cherokee court had upon the indictment and trial of the petitioner. In the copy of the indictment contained in the original transcript, filed in this court, it was recited that the indictment was found by the grand jury on the 1st day of December, 1892, while the offence therein stated was alleged to have been committed " on or about the 3d day of December, 1892." The evidence contained in the transcript, however, showed that the offence was committed on November 3, 1892, and in a supplement to the transcript, filed in this court, it appears that said date was given in the indictment. No motion or demurrer or other attack upon the sufficiency of the indictment was made upon the trial in

the Cherokee court based upon the ground that the offence was stated in the indictment to have been committed on a date subsequent to the finding of the indictment, nor is there any specification of error of that character contained in the petition for the allowance of the writ of *habeas corpus.* After hearing, the district judge discharged the writ and remanded the petitioner to the custody of the sheriff, and from this judgment the appeal now under consideration was allowed.

*Mr. Leonidas D. Yarrell* for appellant. *Mr. Elijah V. Brookshire* and *Mr. Benjamin T. Duval* were on his brief.

*Mr. R. C. Garland* for appellee. *Mr. A. H. Garland* and *Mr. William M. Cravens* were on his brief.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

Prior to May, 1892, a law enacted by the legislature of the Cherokee nation made it the duty of the judges of the Circuit and District Courts of the nation, fourteen days before the commencement of the first regular term of said courts, to furnish to the sheriff a list of the names of five persons, who should be summoned by the sheriff to act as grand jurors for that district during the year. The first regular term of the courts named commenced on the second Monday in May. On November 28, 1892, a law was enacted providing for the summoning and empanelling of a grand jury of thirteen, the names of the persons to compose such jury to be furnished to the sheriff, as under the previous law, fourteen days before the commencement of the regular term of the Circuit and District Courts. There was no express repeal of the provisions of the prior law. Under the terms of the act of November 28, 1892, a grand jury could not have been empanelled before the term beginning on the second Monday of May, 1893. The indictment in question was returned in December, 1892, by a grand jury consisting of five persons, which grand jury had been empanelled under the prior law, to serve during the year 1892.

The right of the appellant to the relief which he seeks must exist, if at all, by virtue of section 753 of the Revised Statutes of the United States, which is as follows:

"The writ of *habeas corpus* shall in no case extend to a prisoner in jail, unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States; or, being a subject or citizen of a foreign State, and domiciled therein, is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection or exemption claimed under the commission, or order, or sanction of any foreign State, or under color thereof, the validity and effect whereof depend upon the law of nations; or unless it is necessary to bring the prisoner into court to testify."

Appellant and the person he was charged with having murdered were both Cherokee Indians, and the crime was committed within the Cherokee territory.

To bring himself within the statute, the appellant asserts, 1st, that the grand jury, consisting only of five persons, was not a grand jury within the contemplation of the Fifth Amendment to the Constitution, which it is asserted is operative upon the Cherokee nation in the exercise of its legislative authority as to purely local matters; 2d, that the indictment by a grand jury thus constituted was not due process of law within the intendment of the Fourteenth Amendment; 3d, even if the law of the Cherokee nation providing for a grand jury of five was valid under the Constitution of the United States such law had been repealed, and was not therefore in existence at the time the indictment was found. A decision as to the merits of these contentions involves a consideration of the relation of the Cherokee nation to the United States, and of the operation of the constitutional provisions relied on upon the purely local legislation of that nation.

By treaties and statutes of the United States the right of

the Cherokee nation to exist as an autonomous body, subject always to the paramount authority of the United States, has been recognized. And from this fact there has consequently been conceded to exist in that nation power to make laws defining offences and providing for the trial and punishment of those who violate them when the offences are committed by one member of the tribe against another one of its members within the territory of the nation.

Thus, by the fifth article of the treaty of 1835, 7 Stat. 478, 481, it is provided:

"The United States hereby covenant and agree that the lands ceded to the Cherokee nation in the foregoing article shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory. But they shall secure to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them: Provided always that they shall not be inconsistent with the Constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians; and also, that they shall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the government of the same."

This guarantee of self government was reaffirmed in the treaty of 1868, 14 Stat. 799, 803, the thirteenth article of which reads as follows:

"Article XIII. The Cherokees also agree that a court or courts may be established by the United States in said territory, with such jurisdiction and organized in such manner as may be prescribed by law: *Provided,* That the judicial tribunals of the nation shall be allowed to retain exclusive jurisdiction in all civil and criminal cases arising within their country in which members of the nation, by nativity or

adoption, shall be the only parties, or where the cause of action shall arise in the Cherokee nation, except as otherwise provided in this treaty."

So, also, in "An act to provide a temporary government for the Territory of Oklahoma, to enlarge the jurisdiction of the United States court in the Indian Territory, and for other purposes," approved May 2, 1890, c. 182, 26 Stat. 81, it was provided, in section 30, as follows:

"That the judicial tribunals of the Indian nations shall retain exclusive jurisdiction in all civil and criminal cases arising in the country in which members of the nation by nativity or by adoption shall be the only parties; and as to all such cases the laws of the State of Arkansas extended over and put in force in said Indian Territory by this act shall not apply."

And section 31 of the last mentioned act closes with the following paragraph:

"The Constitution of the United States and all general laws of the United States which prohibit crimes and misdemeanors in any place within the sole and exclusive jurisdiction of the United States except in the District of Columbia, and all laws relating to national banking associations, shall have the same force and effect in the Indian Territory as elsewhere in the United States; but nothing in this act shall be so construed as to deprive any of the courts of the civilized nations of exclusive jurisdiction over all cases arising wherein members of said nations, whether by treaty, blood or adoption, are the sole parties, nor so as to interfere with the right and powers of said civilized nations to punish said members for violation of the statutes and laws enacted by their national councils where such laws are not contrary to the treaties and laws of the United States."

The crime of murder committed by one Cherokee Indian upon the person of another within the jurisdiction of the Cherokee nation is, therefore, clearly not an offence against the United States, but an offence against the local laws of the Cherokee nation. Necessarily, the statutes of the United States which provide for an indictment by a grand jury, and the number of persons who shall constitute such a body, have

no application, for such statutes relate only, if not otherwise specially provided, to grand juries empanelled for the courts of and under the laws of the United States.

The question, therefore, is, does the Fifth Amendment to the Constitution apply to the local legislation of the Cherokee nation so as to require all prosecutions for offences committed against the laws of that nation to be initiated by a grand jury organized in accordance with the provisions of that amendment. The solution of this question involves an inquiry as to the nature and origin of the power of local government exercised by the Cherokee nation and recognized to exist in it by the treaties and statutes above referred to. Since the case of *Barron* v. *Baltimore*, 7 Pet. 243, it has been settled that the Fifth Amendment to the Constitution of the United States is a limitation only upon the powers of the General Government, that is, that the amendment operates solely on the Constitution itself by qualifying the powers of the National Government which the Constitution called into being. To quote the language of Chief Justice Marshall, this amendment is limitative of the " powers granted in the instrument itself and not of distinct governments framed by different persons and for different purposes. If these propositions be correct, the Fifth Amendment must be understood as restraining the power of the General Government, not as applicable to the States." The cases in this court which have sanctioned this view are too well recognized to render it necessary to do more than merely refer to them. *Fox* v. *Ohio*, 5 How. 410, 424; *Withers* v. *Buckley*, 20 How. 84; *Twitchell* v. *The Commonwealth*, 7 Wall. 321; *Edwards* v. *Elliott*, 21 Wall. 532, 557; *Pearson* v. *Yewdall*, 95 U. S. 294, 296; *Davis* v. *Texas*, 139 U. S. 651.

The case in this regard therefore depends upon whether the powers of local government exercised by the Cherokee nation are Federal powers created by and springing from the Constitution of the United States, and hence controlled by the Fifth Amendment to that Constitution, or whether they are local powers not created by the Constitution, although subject to its general provisions and the paramount authority of Con-

gress. The repeated adjudications of this court have long since answered the former question in the negative. In *Cherokee Nation* v. *Georgia*, 5 Pet. 1, which involved the right of the Cherokee nation to maintain an original bill in this court as a foreign State, which was ruled adversely to that right, speaking through Mr. Chief Justice Marshall, this court said (p. 16):

"Is the Cherokee nation a foreign State in the sense in which that term is used in the Constitution?

"The counsel for the plaintiffs have maintained the affirmative of this proposition with great earnestness and ability. So much of the argument as was intended to prove the character of the Cherokees as a State, as a distinct political society, separated from others, capable of managing its own affairs and governing itself, has, in the opinion of a majority of the judges, been completely successful. They have been uniformly treated as a State from the settlement of our country. The numerous treaties made with them by the United States recognize them as a people capable of maintaining the relations of peace and war, of being responsible in their political character for any violation of their engagements or for any aggression committed on the citizens of the United States by any individual of their community. Laws have been enacted in the spirit of these treaties. The acts of our government plainly recognize the Cherokee nation as a State, and the courts are bound by those acts."

It cannot be doubted, as said in *Worcester* v. *The State of Georgia*, 6 Pet. 515, 559, that prior to the formation of the Constitution treaties were made with the Cherokee tribes by which their autonomous existence was recognized. And in that case Chief Justice Marshall also said (p. 559):

"The Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights. . . . The very term 'nation,' so generally applied to them, means a 'people distinct from others.' The Constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Ind-

ian nations, and consequently admits their rank among those powers who are capable of making treaties."

In reviewing the whole subject in *Kagama* v. *United States*, 118 U. S. 375, this court said (p. 381):

" With the Indians themselves these relations are equally difficult to define. They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union, or of the State within whose limits they resided."

True it is that in many adjudications of this court the fact has been fully recognized, that although possessed of these attributes of local self government, when exercising their tribal functions, all such rights are subject to the supreme legislative authority of the United States. *Cherokee Nation* v. *Kansas Railway Co.*, 135 U. S. 641, where the cases are fully reviewed. But the existence of the right in Congress to regulate the manner in which the local powers of the Cherokee nation shall be exercised does not render such local powers Federal powers arising from and created by the Constitution of the United States. It follows that as the powers of local self government enjoyed by the Cherokee nation existed prior to the Constitution, they are not operated upon by the Fifth Amendment, which, as we have said, had for its sole object to control the powers conferred by the Constitution on the National Government. The fact that the Indian tribes are subject to the dominant authority of Congress, and that their powers of local self government are also operated upon and restrained by the general provisions of the Constitution of the United States, completely answers the argument of inconvenience which was pressed in the discussion at bar. The claim that the finding of an indictment by a grand jury of less than thirteen violates the due process clause of the Fourteenth Amendment is conclusively answered by *Hurtado* v. *California*, 110 U. S. 516, and *McNulty* v. *California*, 149

U. S. 645. The question whether a statute of the Cherokee nation which was not repugnant to the Constitution of the United States or in conflict with any treaty or law of the United States had been repealed by another statute of that nation, and the determination of what was the existing law of the Cherokee nation as to the constitution of the grand jury, were solely matters within the jurisdiction of the courts of that nation, and the decision of such a question in itself necessarily involves no infraction of the Constitution of the United States. Such has been the decision of this court with reference to similar contentions arising upon an indictment and conviction in a state court. *In re Duncan*, 139 U. S. 449. The ruling in that case is equally applicable to the contentions in this particular arising from the record before us.

The counsel for the appellant has very properly abandoned any claim to relief because of alleged errors occurring subsequent to the finding of the indictment. As to the point raised in reference to the date of the commission of the offence as stated in the indictment, the record as corrected shows that the error in question did not exist. It is, therefore, unnecessary to notice the argument based upon the assumption that the indictment charged the offence to have been committed subsequent to the finding of the true bill.

The judgment is

*Affirmed.*

MR. JUSTICE HARLAN dissented.